NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| COMBINED COMPANIES, INC., <br><br> and <br><br> WINBACK & CONSERVE PROGRAM, INC., ONE STOP FINANCIAL, INC., GROUP DISCOUNTS, INC. and 800 DISCOUNTS, INC., <br><br>             Plaintiffs, <br><br> v. <br><br> AT&T CORP., <br><br>             Defendant. | Civ. No. 95-908 (WGB) <br><br> **OPINION** |

**APPEARANCES:**

Frank P. Arleo, Esq.
ARLEO & DONOHUE, L.L.C.
622 Eagle Rock Avenue
Penn Federal Building
West Orange, New Jersey 07052

> Attorney for Plaintiffs, Winback &
> Conserve Program, Inc., One Stop Financial,
> Inc., Group Discounts, Inc. and 800
> Discounts, Inc.

Richard H. Brown
PITNEY HARDIN LLP
P.O. Box 1945
Morristown, New Jersey 07962-1945

> Attorney for Defendant AT&T Corp.

**BASSLER, SENIOR DISTRICT JUDGE:**

Winback & Conserve Program, Inc., One Stop Financial, Inc.,

Group Discounts, Inc. and 800 Discounts, Inc. ("Plaintiffs" or

the "Inga Companies")[1] seek to vacate a stay order imposed by Magistrate Judge Hedges of the District Court of New Jersey pending a Federal Communications Committee ("FCC") determination. For the reasons discussed below, the Court denies Plaintiffs' motion to lift the stay.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 47 U.S.C § 207. Venue is proper pursuant to 28 U.S.C. § 1391.

**I. BACKGROUND**

AT&T is a telecommunications carrier regulated under Title II of the Communications Act of 1934, as amended. The Communications Act requires all common carriers to file with the FCC schedules, i.e., tariffs, "showing all charges" and "showing the classifications practices, and regulations affecting such charges." 47 U.S.C. § 203(a). A tariff is a public document, which defines the terms and conditions upon which a carrier offers and provides services to its customers. See e.g., Brown v. MCI World Com Network Serv., Inc., 277 F.3d 1166, 1170 (9th Cir. 2002). One of the services that AT&T Corporation ("AT&T") provides is inbound telecommunication service (i.e. 800 service). Under AT&T's Tariff No. 2, AT&T allowed companies, such as Plaintiffs, to purchase and resell 800 service to small

---

[1] The Inga Companies are owned by Alfonso Inga, a New Jersey businessman.

2

businesses around the country.

Plaintiffs have been resellers or "aggregators" of inbound toll free service also known as Wide Area Telephone Service ("WATS") since 1989.  By aggregating service, Plaintiffs can commit to a certain volume of traffic.  AT&T provides volume discounts to those customers that commit to a certain volume of traffic for a specified period of time.  Consequently, Plaintiffs are able to provide service to small businesses, which cannot obtain the best deal directly with the common carrier because of their low volume of service usage.  These small business are called the end-users of AT&T's 800 service.

Plaintiffs sign onto a specific AT&T plan, which outlines the terms of the agreement between AT&T and Plaintiffs. Under the plan, if Plaintiffs fail to meet their volume commitments they are accessed "shortfall" charges, which amount to the deficiency in usage over the contract term.  Additionally, if a plan is prematurely terminated the aggregator is liable for a "termination charge."

Plaintiffs subscribed to AT&T's Customer Specific Term Plan II ("CSTP-II"), one of the volume discount plans offered under Tariff No. 2.  Plaintiffs qualified for a 23 percent discount under the CSTP II plan and an additional 5 percent discount for subscribing to AT&T's Revenue Volume Pricing Plan ("RVPP"). Therefore, Plaintiffs were entitled to a total discount of 28

percent from AT&T.

AT&T bills the end-users directly.  Therefore, Plaintiffs must advise AT&T how much of the 28 percent discount it wishes to provide the end-users.  Under AT&T's Enhanced Billing Option ("EBO"), Plaintiffs could give end users one of four set discount levels, 15, 17.5, 20 or 23 percent.  AT&T would then pay Plaintiffs the difference of the 28 percent discount and the amount of discount Plaintiffs offered the end users.

AT&T was the dominant carrier of 800 service.  When other carriers began to acquire a share of the 800 market, however, the FCC began to loosen its regulation of AT&T.  Starting in 1991, the FCC no longer forced AT&T to offer WATS only through the generic plans set forth in Tariff No. 2.  The FCC gave AT&T the option of individually negotiating "contract tariffs," which could be drawn to offer greater discounts than those available under Tariff No. 2.  Public Service Enterprises of Pennsylvania ("PSE") was able to obtain such a contract tariff with AT&T called Contract Tariff 516 ("CT 516").  Under CT 516, PSE enjoyed the same CSTP II discounts of 28 percent as Plaintiffs did, but PSE also received an additional 38 percent discount under CT 516 and other offerings from AT&T.

Seeing these types of discounts being offered to their competitors, Plaintiffs, like many resellers, sought to obtain them.  In particular, Plaintiffs conducted a series of

4

transactions designed to move their business from Tariff No. 2 to a more lucrative contract tariff. First, Plaintiffs transferred all nine of their plans to a new entity, Combined Companies Incorporated ("CCI"), a former plaintiff in this action, which was in negotiations with AT&T to receive a contract tariff agreement.[2] During those negotiations, CCI planned to transfer all the traffic from the plans it had obtained from Plaintiffs to PSE until CCI could obtain a plan comparable to CT 516. On January 13, 1995, PSE and CCI jointly executed and submitted written orders to AT&T to transfer only the 800 traffic that CCI obtained from Plaintiffs from CCI to PSE, without transferring the actual plans themselves. That way, CCI and Plaintiffs would receive the 66 percent discount of CT 516 instead of the 28 percent discount provided under the CSTP II/RVPP plan.[3]

AT&T initially refused to accept the first transfer ("Inga Companies/CCI transfer") unless CCI paid a deposit fearing that CCI would not have the assets to meet its obligations under the transferred plans. AT&T also refused the second transfer ("CCI/PSE transfer") on the ground that by transferring the 800 traffic without the plans, CCI was effectively avoiding any

---

[2] CCI was a Plaintiff in this action until it settled with AT&T in 1996.

[3] The agreement between Plaintiffs and CCI states that the end-user traffic would be owned 20 percent by CCI and 80 percent by plaintiffs. The arrangement between CCI and PSE was similar.

shortfall or termination charges.  AT&T claimed that without the revenue generated by the traffic under the plans, CCI would have no income and no means of backing the responsibilities it maintained after the CCI/PSE transfer of traffic was executed.

The Inga Companies claimed that both transfers were valid under AT&T Tariff No. 2.  Section 2.1.8 of Tariff No. 2 provides:

> Transfer or Assignment - WATS, including any associated telephone number(s), may be transferred or assigned to a new Customer, provided that:
>
> A.  The Customer of record (former Customer) requests in writing that the company transfer or assign WATS to the new Customer.
>
> B.  The new Customer notifies the Company in writing that it agrees to assume all obligations of the former Customer at the time of transfer or assignment.  These obligations include (1) all outstanding indebtedness of the service and (2) the unexpired portion of any applicable minimum payment period(s).
>
> C.  The Company acknowledges the transfer or assignment in writing.  The acknowledgment will be made within 15 days of receipt of notification.
>
> The transfer or assignment does not relieve or discharge the former Customer from remaining jointly and severally liable with the new Customer for any obligations existing at the time of transfer or assignment.  These obligations include: (1) all outstanding indebtedness for WATS, and (2) the unexpired portion of any applicable minimum payment period(s).  When a transfer or assignment occurs, a Record Change Only Charge applies (see Record Change Only, Section 3).

The parties to the transfer then would be required to execute a Transfer of Service and Agreement form and submit the form to AT&T.

After AT&T refused to grant the transfers, the Inga Companies and CCI sued AT&T.

**II. PROCEDURAL HISTORY**

In 1995, the Inga Companies and CCI sued AT&T alleging that because AT&T refused to transfer the Inga Companies' plans to CCI without a deposit and subsequently failed to transfer the end user traffic from CCI to PSE, AT&T violated several provisions of the Communications Act.  47 U.S.C. § 201, et seq.  Judge Politan of the New Jersey District Court entered a preliminary injunction against AT&T requiring it to allow the Inga Companies/CCI transfer.  The Court reasoned that no requirement for a deposit existed under § 2.1.8.  Combined Companies, Inc. v. AT&T Corp., No. 95-908 at 20 (D.N.J. May 19, 2005)("May 2005 DNJ Opinion") [4]

The Court, however, withheld making a decision on the CCI/PSE transfer based on the doctrine of primary jurisdiction. The Court held that the determination of whether § 2.1.8 allowed an aggregator to transfer its traffic under a plan without the plan fell within the primary jurisdiction of the FCC because the proper interpretation of the tariff was uniquely within the expertise and experience of the agency.  May 2005 DNJ Opinion at 16.  Moreover, the Court held that "the proper application of administrative discretion to that issue will best protect against

---

[4] AT&T did not appeal this portion of the Court's decision, and it is therefore, not at issue here.

7

inconsistencies of outcome." Id.  Furthermore, AT&T had submitted transmittal 8179, a proposed tariff change that it claimed would clarify the requirements of § 2.1.8.  Therefore, the Court was further persuaded to hold off deciding the CCI/PSE issue while awaiting the FCC's decision on transmittal 8179.  Id.

After Judge Politan's May 2005 ruling, however, AT&T withdrew transmittal 8179 purportedly after the FCC advised AT&T that the transmittal would have prospective effect only.  On October 26, 1995 it filed a second transmittal offering proposed revisions to clarify six of AT&T's tariffs.  The Inga Companies and CCI then filed a motion for reconsideration in the District Court on the ground that AT&T had thwarted the FCC's ability to determine the issue by dilatory tactics and by abuse of process counter to the intent of the District Court's ruling.  AT&T argued that the Inga Companies and CCI had taken no steps to have the FCC proceed on their claims.  Agreeing with the Inga Companies and CCI, the District Court granted a preliminary injunction directing that until the FCC made a determination, AT&T was required to grant the CCI/PSE transfer.  Combined Companies, Inc. v. AT&T Corp., No. 95-908 (D.N.J. Mar. 5, 1996) ("Mar. 1996 DNJ Opinion").

On appeal, the Third Circuit held that the District Court's ruling contradicted its previous finding that primary jurisdiction required a determination by the FCC and therefore,

vacated the District Court's ruling, referring the inquiry regarding the CCI/PSE transfer back to the FCC. <u>Combined Companies, Inc. v. AT&T Corp.</u>, No. 96-5185 at 3 (3d Cir. May 31, 1996) ("May 1996 3d Cir. Opinion"). In response to the Third Circuit's directive, Magistrate Judge Hedges entered an Order staying the case "until all proceedings before the FCC were concluded." While the case was pending before the FCC, AT&T entered into a settlement with CCI, extinguishing its WATS plans and releasing all claims between the two parties. Apparently as a result of this settlement, the FCC took no action on the case for seven years. See <u>AT&T Corp. v. FCC</u>, 394 F.3d 933 (D.C. Cir. 2005).

**FCC Decision**

In 2003, the FCC finally addressed the Third Circuit referral finding that § 2.1.8 did not govern the CCI/PSE transaction where solely traffic was being transferred. The FCC reasoned that "the purpose [of Section 2.1.8] was to maintain intact the balance of obligations and benefits between parties under the tariff when one customer stepped into the shoes of another." October 17, 2003, FCC Memorandum Opinion and Order at 7 ("Oct. 2003 FCC Opinion"). Therefore, the FCC found that the section could not apply to a transaction where only the end user traffic would be moved and the parties to the transaction would retain the benefits and obligations of their respective

agreements.  Id.  Further, the FCC concluded that no other AT&T tariff prohibited the transfer, and therefore, AT&T should have allowed the transfer.  Id. at 10.  The D.C. Circuit Court disagreed with the FCC.

### D.C. Circuit Opinion

The D.C. Circuit Court granted AT&T's petition for review of the FCC decision on January 14, 2005.  The Court held that the FCC wrongly concluded that § 2.1.8 did not apply to the CCI/PSE transfer.  The Court reasoned that, "the [s]ection on its face does not differentiate between transfers of entire plans and transfers of traffic, but rather speaks only in terms of WATS-the telephone service itself."  AT&T Corp. v. FCC, 394 F.3d at 936.  The Court agreed with AT&T's argument that "traffic," even if it is not the same thing as a tariffed plan, is a type of Wide Area Telecommunication Service covered by the plan, which is governed by § 2.1.8.  Id. at 937.

The Court further held that the FCC had incorrectly relied on one statement by AT&T that "in this case the relevant WATS services are the CSTP II Plans" to arrive at its determination that § 2.1.8 only applies to plans and not to traffic.  Id. (citing Comments of AT&T Corp. in Opposition to Joint Petition for Declaratory Ruling and Joint Motion for Expedited Consideration at 10).  The Court noted that AT&T's vehement argument that the CCI/PSE plan violated the express terms of §

10

2.1.8 is evidence that it did not concede that § 2.1.8 did not govern the transfer.  Id.

AT&T additionally argued to the D.C. Circuit that by its terms, § 2.1.8 allows a transfer of CCI's service to PSE only if PSE agreed to assume all obligations under the plan.  AT&T further contended that since the parties to the transfer had amended the Transfer of Service form to state that "Traffic Only" would be transferred between CCI and PSE, they had expressly admitted that PSE did not intend to assume all obligations under CCI's plans.  Id.

The D.C. Circuit ruled that § 2.1.8 does not allow a party to transfer benefits associated with 800 service without assuming any obligations.  The Court refused, however, to decide what obligations should have been transferred since the FCC had initially determined that § 2.1.8 did not govern the transfer at all and the question of identifying the obligations was not before it.  Id. at 939.

Contending that the issue referred to the FCC had been conclusively decided by the D.C. Circuit Court, the Inga Companies filed a motion to lift the stay imposed by Judge Hedges.

**III.   DISCUSSION**

Plaintiffs note that the Third Circuit's opinion makes clear that the issue submitted to the FCC was "whether Section 2.1.8

11

permits an aggregator to transfer traffic under the plan without transferring the plan itself in the same transaction." Plaintiffs' Memorandum in Support of the Motion to Lift the Stay ("Pls. Mem.") at 9(citing May 1996 3d Cir. Opinion at 3). Plaintiffs argue that the Court should lift the stay because the D.C. Circuit "conclusively decided that issue in plaintiffs' favor." Id. AT&T concedes (and has always conceded) that § 2.1.8 of Tariff No. 2 applies to the proposed transfers. AT&T's Memorandum in Opposition to Motion to Lift Stay ("AT&T Mem.") at 2. AT&T argues, however, that the stay should not be lifted because the D.C. Circuit's opinion was limited to a finding that § 2.1.8 governed the proposed transfer but left open the determination of what obligations were required to be transferred under § 2.1.8 and therefore, whether the CCI/PSE transfer was appropriate. The Court agrees with AT&T.

The D.C. Circuit clearly stated that "we do not reach the remaining issues addressed by the Commission and argued by the parties before us." AT&T Corp., 394 F.3d at 939. The Court noted that the FCC's determination was predicated completely on the wrong conclusion that § 2.1.8 did not apply to the movement of traffic. Id. at 936. Although the Court did not expressly remand the case back to the FCC, as AT&T suggests (AT&T Mem. at 2), the Court did not make a final determination as to whether § 2.1.8 permitted the CCI/PSE transfer. Even though the FCC had

determined that no other provision of AT&T's tariff prohibited the transfer, it had not considered whether the transfer complied with the requirements of § 2.1.8 because it had determined that the provision did not apply.  Therefore, the D.C. Circuit, on a petition for review, did not have the authority to consider that issue, which is therefore, left unresolved.

Although Plaintiffs correctly state the issue that was referred to the FCC (see supra at 11), Plaintiffs fail to recognize that the issue was referred to the FCC in the context of the CCI/PSE transaction.  In its May 1995 ruling, the District Court particularly held that "the CCI/PSE transfer -- should be determined by the FCC."  It further held that the FCC was the proper forum to address "whether a plan and its attendant obligations under a tariff may be separated from its traffic -- when that traffic might well constitute the only guarantee available that the plan's obligations will be honored."  March 1995 DNJ Opinion at 15.  Had the FCC not wrongly determined that § 2.1.8 did not govern the CCI/PSE transfer, the FCC would have had to make a determination of whether the party had assumed all obligations required by § 2.1.8 in order to determine whether the provision permits the transfer.

Section 2.1.8 requires that "the new Customer [must] assume all obligations of the former Customer. . . .These obligations include (1) all outstanding indebtedness for the service and (2)

13

the unexpired portion of any applicable minimum payment period(s)." AT&T contends that all obligations include shortfall and termination charges. AT&T Mem. at 5, 12-15. Plaintiffs disagree claiming that these charges are not included in the list of obligations expressly found in § 2.1.8 and that, regardless, Plaintiffs' plans are not subject to those charges as they were grandfathered for life in the market place. Pls. Mem. at 14.

This determination requires an analysis of whether the obligations mentioned in § 2.1.8 is an exhaustive list and what those obligations include.[5] Furthermore, the D.C. Circuit clearly noted that "[h]ow this enumeration affects the requirement that new customers assume 'all obligations of the former Customer' is beyond the scope of our opinion" recognizing that the FCC had not addressed this issue. AT&T Corp., 394 F.3d

---

[5]Plaintiffs argue that the FCC already addressed whether shortfall and termination obligations were to be assumed by PSE. Pls. Mem. at 11-12. The FCC only discussed shortfall and termination charges in the context of the fraudulent use provision, § 2.2.4, in Tariff No. 2. The FCC found that AT&T's speculation that CCI was trying to avoid paying shortfall charges was unfounded because CCI could have amassed new traffic in order to meet its commitments under the CSTP II plans once it had transferred the traffic from those plans to PSE's CT 516. The FCC did not determine, however, whether PSE was required to assume those commitments under § 2.1.8, because it had already determined that § 2.1.8 did not apply. Additionally, the FCC states that AT&T conceded that termination charges were not at issue here. Oct. 2003 FCC Opinion at 8, n.56. It is not clear, however, in what context AT&T made this statement. Regardless, the FCC concluded this after determining that § 2.1.8 did not apply and therefore, this point does not aid this Court's analysis.

at 939, n.2.  The Court finds that this determination involves technical questions of fact (such as the intent of the drafter) and is uniquely within the expertise of the FCC, which has primary jurisdiction over this matter.  Richman Bros. Records, Inc. v. U.S. Sprint Comm. Co., 953 F.2d 1431, 1435, n.3 (3d Cir. 1991).

The doctrine of primary jurisdiction serves several different important policy goals.  As explained by the Third Circuit in MCI Communications Corp. v. AT&T, 496 F.2d 214, 220 (3d Cir. 1974).  The Court summarized that:

> [P]rimary jurisdiction has been developed by courts in order to avoid conflict between the courts and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court.

Id.; see also Nader v. Allegheny Airlines, 426 U.S. 290, 303-04 (1976).

In Mical Communications, Inc. v. Sprint Telemedia, 1 F.3d 1031, 1038 (10th Cir. 1993), the court listed several factors considered by courts in deciding the applicability of the primary jurisdiction doctrine in certain cases.  Some courts examine whether issues of fact inherent in the case are within or without the conventional experience of judges; whether the exercise of administrative discretion is needed to resolve issues of fact in the case; and whether the area of business in which the dispute arose is entrusted to a specific agency whose resolution of the

matter might best afford uniformity and consistency of conclusion.  Id.

Other courts focus on whether the need for speedy judicial resolution of the issue outweighs the benefit of obtaining the agency's determination on the matter.  In balancing speed versus expertise the courts consider the following factors: "'how agency action will aid the litigation; whether the litigation involves conduct requiring continuing supervision by the agency; whether the issues to be litigated are unique to regulated industries; and whether proceedings already are pending before the agency.'" Id. (quoting, inter alia, Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1376-77 (9th Cir. 1989); Gulf States Utils. Co. v. Alabama Power Co., 824 F.2d 1465, 1473 (5th Cir. 1987)).

The Court concludes, as did the District Court, in its May 1995 ruling, that the tariff provision is "not clear on its face."  May 1995 DNJ Opinion at 15.  The issue of whether § 2.1.8 allows an aggregator to transfer traffic without transferring its plans while assuming only those obligations assumed by PSE has yet to be answered.[6]  By finding that § 2.1.8 did not even apply

---

[6] Plaintiffs have made two supplemental submissions to support their motion.  Included in these submissions is a certification by Larry G. Shipp, CCI's President, purporting to clarify the "nature and type of obligations" at issue in this matter and an undated section of notes supposedly prepared by unidentified members of the FCC.  These documents do not conclusively decide this matter in Plaintiffs' favor as Plaintiffs' suggests.  In fact, they only strengthen this Court's initial decision that a determination involving the

to the CCI/PSE transfer, the FCC failed to answer this question.

The Third Circuit already has cautioned this Court about making a determination more appropriately left to the FCC. May 1996 3d Cir. Opinion, at 7. The Third Circuit noted that "[h]aving correctly referred the question to the FCC under the doctrine of primary jurisdiction, the district court should have insisted that the parties take the proper steps to proceed expeditiously in that forum." Id.

The Court finds that the FCC is the appropriate forum to determine whether shortfall and termination charges is included in the "all obligations" language of § 2.1.8.[7] See also American Telephone and Telegraph Co. v. Jiffy Lube Int'l, Inc., 813 F.Supp. 1164 (D. Md. 1993)("[T]he FCC, the federal agency charged with promulgating and interpreting tariffs . . . should, as the agency with the expertise in the communications arena, weigh such considerations.") The language of the Third Circuit in its

---

interpretation of language in a tariff is better left for the FCC's expertise in this field.

[7]Plaintiffs stress that this case has been pending for several years. Some of the delay, however, has been caused by Plaintiffs as noted by the Third Circuit. May 1996 3d Cir. Opinion at 6. Additionally, as the Third Circuit noted earlier Plaintiffs had a choice to pursue its claims in this Court or seek a determination from the FCC and again Plaintiffs chose the District Court instead of the FCC. A reading of the final paragraph of the D.C. Circuit opinion makes clear that a number of issues are left to be resolved, which involve an interpretation of Tariff No. 2. Plaintiffs decided not to seek further clarification from the FCC, and therefore, any further delay in this matter is attributable to Plaintiffs.

opinion of May 31, 1996 is as applicable today as it was then: "Application of the doctrine of primary jurisdiction rests on considerations of policy in the important communications field and a substantial public interest in securing an agency ruling on the matter in dispute." May 1996 3d Cir. Opinion at 7.

**IV. CONCLUSION**

For the reasons stated in this Opinion, this Court denies Plaintiffs' motion to lift the stay.

An appropriate Order accompanies this Opinion.

                                             /s/ WILLIAM G. BASSLER
                                             WILLIAM G. BASSLER, U.S.S.D.J.

Dated: May 31, 2006